# EXHIBIT "B"

**EXHIBIT A**

[Description of the Premises]


A SECOND FLOOR PLAN
SCALE: 3/16" = 1'-0"
OFFICE 01 145 SF
LARGE CONF. ROOM 279 SF
OFFICE 02 127 SF
RECEPTION 512 SF
FUTURE OFFICE 03 104 SF
OFFICE 07 149 SF
FILES/ WORKSTATION
OFFICE 08 107 SF
SMALL CONF. ROOM 197 SF
OFFICE 09 104 SF
TEL/ DATA 74 SF
ELEVATOR LOBBY
ELEVATOR
ARCHWAY
607 SF
PHONE/ MECH 88 SF
KITCHEN 217 SF
FILES
RAMP UP
RAMP DN.
OFFICE 04 180 SF
OFFICE 05 186 SF
ELEC OFFICE 06 196 SF
TEMP. WALL
ABANDONED SERV. ELEV.
REQUIRES DEDICATED OUTLET

EXHIBIT "B"

WORK AGREEMENT FOR
COMPLETION OF THE PREMISES

Landlord and Tenant executed a Lease for Premises on the Second floor of the Building and hereby attach this Work Agreement to said Lease as Exhibit "B" thereto. To induce Tenant to enter into the Lease and in consideration of the mutual covenants herein contained, Landlord and Tenant agree as follows:

ARTICLE 1 - DEFINITIONS

The following terms shall have the meanings described below. Terms not defined herein shall have the meaning given in the Lease:

Architect shall mean ________ and shall be registered in the state of Rhode Island.

Base Building Improvements shall mean Building Standard improvements to be constructed or installed in the Building.

Building Plans and Specifications shall mean the final drawings and specifications for Base Building Improvements.

Building Standard Materials shall mean such materials described in the Building Plans and Specifications, or materials of comparable quality substituted therefor by Landlord.

Contractor shall mean the party selected herein to do the Tenant Improvements.

Change Order shall mean any alteration, substitution, addition or change to or in the Tenant Space Plans or Tenant Construction Documents requested by Tenant Agent (provided in Section 4.02 of this Exhibit B) in writing after the same have been consented to by Landlord.

Completion Date shall mean the date of Substantial Completion of Tenant Improvements under the Tenant Construction Documents (except Punchlist Items) as evidenced by a Certificate of Occupancy with a copy of the same sent to Tenant's notice address.

Construction Contract shall mean the agreement to be entered between Landlord and Contractor for the construction of the Tenant Improvements.

Punchlist Items shall mean those items not completed in the Premises at the time of the Substantial Completion, as identified in a written list, which do not substantially interfere with Tenant's use or enjoyment of the Premises.

Substantial Completion or Substantially Complete shall be as described in Section 3.04 hereof.

Tenant Improvements shall mean all improvements constructed or installed in or on the Premises in accordance with the Tenant Construction Documents.

Tenant Construction Documents shall mean the working drawings, specifications and finish schedules for the Tenant Improvements prepared and sealed by Architect and consented to by Tenant in accordance herewith.

Tenant Space Plans shall mean the schematic presentation of the Premises prepared by Architect and consented to by Tenant in accordance herewith.

Tenant's Work shall mean all work in or about the Premises not within the scope of the work necessary to construct the Tenant Improvements, such as (by way of illustration and not limitation) delivering and installing furniture, telephone equipment and wiring and office equipment..

## ARTICLE 2. TENANT SPACE PLANS AND TENANT IMPROVEMENT PLANS AND SPECIFICATIONS

### Section 2.01 Schedule for Preparation

Landlord shall contract with Architect for the preparation of the Tenant Space Plans and Tenant Construction Documents. Tenant Space Plans and Tenant Construction Documents for the Tenant Improvements shall be prepared by Architect and consented to by Tenant in writing as provided herein below. Tenant Space Plans have been prepared and sealed by an architect licensed in Rhode Island and are attached as Exhibit B-1.

1. Within five (5) days of full Lease execution, Architect shall prepare and deliver to Tenant the prepared Tenant Construction Documents.

2. By the end of the third (3rd) full Working Day after receipt of the Tenant Construction Documents, Tenant shall review and resubmit the same to Architect, either with Tenant's consent or comments thereto.

3. By the end of the third (3rd) full Working Day after receipt of Tenant's comments to the Tenant Construction Documents, Architect shall resubmit to Tenant the Tenant Construction Documents with such changes or information as requested by Tenant.

4. The process described in Section 2.01(1), (2) and (3) shall continue until Tenant is satisfied that such proposed Tenant Construction Documents are acceptable, but once Tenant Construction Documents have been resubmitted to Tenant, Tenant shall confine Tenant's comments thereupon only to changes made by Architect or the changes

requested by Tenant to the prior submission of Tenant Construction Documents, but not made by Landlord's Architect. Once Tenant is satisfied that such proposed Tenant Construction Documents are acceptable, Tenant shall notify Landlord, and the Tenant Construction Documents consented to by Tenant shall constitute the final Tenant Construction Documents.

10. Any approval or consent by Landlord of any items submitted by Tenant to and/or reviewed by Landlord pursuant to this Work Letter shall be deemed to be strictly limited to an acknowledgment of approval or consent by Landlord thereto and shall not imply or be deemed to imply any representation or warranty by Landlord that the design is safe or structurally sound or will comply with any legal or governmental requirements. Any deficiency, mistake or error in design (expressly excluding the engineering drawings), although the same has the consent or approval of Landlord, shall be the sole responsibility of Tenant, and Tenant shall be liable for all reasonable costs and expenses which may be incurred and all delays suffered in connection with or resulting from any such deficiency, mistake or error in design.

ARTICLE 3. CONSTRUCTION OF TENANT IMPROVEMENTS

Section 3.01 Pricing of Tenant Improvements

(a) Within ten (10) Working Days after final approval of the Tenant Construction Documents.

.

Section 3.02 Construction of Tenant Improvements.

Landlord will enter into a Construction Contract with Contractor to construct the Tenant Improvements. The demolition of the Premises and the furnishing of new ceiling tile and standard building lighting throughout the Premises shall be provided by Landlord at its sole cost and expense.

Section 3.03 Delay

A. Tenant Delay. If there is delay in achieving Substantial Completion of Tenant's Improvements as a result of or in connection with:

i. Tenant's failure to furnish any information or documents in accordance with this Work Letter;

ii. Tenant's request for materials, finishes or installations other than Building Standard Materials, finishes or installations;

iii. Any Change Order and any failure by Tenant to respond to a "Change Order Effect Notice" (as herein defined) within the time period required hereunder;

iv. Tenant's failure to respond within any of the time periods specified herein;

v. If in the performance or prosecution of Tenant's Work, Tenant's employees or agents interfere with or in any manner hinder Contractor from prosecuting to the fullest extent possible the Tenant Improvements work; or

vi. Tenant's failure to return properly executed original counterparts of this Lease to Landlord within three (3) Working Days after receipt from Landlord;

then such shall be a "Tenant Delay", and for each of such day of Tenant Delay, Landlord shall have an additional day to complete the work required hereunder.

B. Landlord Delay. If there is delay in achieving Substantial Completion of Tenant's Improvements as a result of or in connection with:

i. Landlord's failure to furnish any information or documents in accordance with this Work Letter;

ii. Landlord's failure to respond within any of the time periods specified herein; ~~or~~

iii. If in the performance or prosecution of Tenant's Work, Landlord's failure to adhere to the time periods specified herein;

iv. Landlord's failure to return properly executed original counterparts of this Lease to Tenant within ten (10) days after receipt from Tenant.

then such shall be a "Landlord Delay", and for each of such day of Landlord Delay, , Rent shall abate for the period that possession by Tenant is delayed and Tenant shall have the remedies provided under the Lease. If such delay continues for more than forty-five (45) days, then Tenant may, within ten (10) days after the expiration of said forty-five (45) day period, give Landlord a notice of election to terminate this Lease (and Tenant's failure to timely provide such notice of termination shall constitute Tenant's waiver of its termination right under this Section 3.03(B)). Unless possession of the Premises shall sooner be made available to Tenant, this Lease shall terminate on the tenth (10th) day after the giving of said notice and Landlord shall return to Tenant any prepaid Rent.

Section 3.04 Completion of Premises

A. The Premises shall be substantially completed, as to any floor, and Substantial Completion shall have occurred, as to any floor, upon the following:

(i) Tenant Improvements shall have been completed as to the floor in substantial compliance with the Construction Contract, except for Punch List Items and otherwise sufficient so that Landlord's Architect can execute the most recently published version of AIA form G704, titled "Certificate of Substantial Completion"; and

(ii) Landlord shall have obtained a certificate of occupancy (or evidence reasonable satisfactory to Tenant that upon completion of the Tenant's

Work, a certificate of occupancy will be issued with a copy of the same provided to Tenant) for the Premises in question, permitting use of the floor of the Premises in question;

provided, to the extent compliance with the conditions set forth above would have occurred earlier but for Tenant Delay, then compliance with such condition shall be deemed to have occurred on the date it would have occurred but for the Tenant Delay.

Section 3.05 Changes in Plans and Specifications

A. If at any time after the Tenant Improvement Costs are determined, Tenant desires to make Change Orders, Tenant shall submit in writing to Landlord for pricing by Contractor working drawings and specifications for any and all such desired Change Order. Landlord shall respond to Tenant, within five (5) Working Days of such request by Tenant, with an estimate of the effect of such desired Change Order on Tenant Improvement Costs and the schedule of anticipated Substantial Completion (the "Change Order Effect Notice"). Tenant shall have three (3) Working Days to respond to such Change Order Effect Notice, with the authorization required hereunder, although Tenant may, within said three (3) Working Day period, request more time to finally respond to the Change Order Effect Notice. A failure by Tenant to respond to any such Change Order Effect Notice shall be denial of consent, and, upon denial, Contractor shall proceed with its work in accordance with the Tenant Improvement Construction Documents. Once the cost and the schedule change, if any, for such Change Order has been approved by Tenant, all references in this Work Agreement to the "Tenant Improvement Construction Documents" shall be to the Tenant Construction Documents, as changed pursuant to this Section 3.05, and all references to "Tenant Improvement Costs" shall include the net aggregate approved cost for the Change Orders determined in this Section 3.05 (after taking into account any savings affected by such Change Order), except that there may be a fee charged by the Tenant Improvement Contractor for any Change Order which reduces Tenant Improvement Costs.

B. Once the Change Order, the costs therefor and the schedule change associated therewith have been approved and a form evidencing such approval executed by Tenant, reasonably satisfactory to Landlord, is delivered to Landlord, Tenant shall have given full authorization to Landlord to cause Contractor to proceed with the work of constructing the Tenant Improvements in accordance with the Tenant Construction Documents as so modified; provided that any changes required by Tenant which constitute a material deviation from the previously approved Tenant Construction Documents shall be effective only after the approval of Landlord, not to be unreasonably withheld, conditioned, or delayed, unless such change would result in a material delay in the completion of the work being done by Contractor.

Section 3.06 General Provisions Applicable to Tenant's Work

1. Landlord will require a high grade, first-class operation to be conducted in the Premises. Tenant's Work shall be performed in a first-class manner, using new and first-class, quality materials. Tenant's Work shall be constructed and installed in accordance with all applicable laws, ordinances, codes and rules and regulations of governmental authorities. Tenant shall promptly correct any of Tenant's Work which is not in conformance therewith.

2. Landlord shall use reasonable efforts to give notice to Tenant of the projected date by which Landlord shall have completed Tenant Improvements at least ten (10) days prior to said date, so Tenant has access to the Premises for the performance of Tenant's Work. Tenant shall commence the performance of such work and diligently pursue such work to completion. Tenant's contract parties and subcontractors shall be subject to administrative supervisions by Landlord in their use of the Building and their relationship with Contractor, or contractors of other tenants in the Building. The entry by Tenant and/or its contract parties into the Premises for the performance of Tenant's Work shall be subject to the Lease, except the payment of Rent. If Landlord allows Tenant and/or its contract parties to enter the Premises and commence the performance of Tenant's Work prior to the Completion Date, such entry by Tenant shall be at Tenant's sole risk.

3. Tenant's Work shall be coordinated and conducted to maintain harmonious labor relations and not (a) to interfere unreasonably with or to delay the completion of any work being performed by Contractor or by any other tenant in the Building; or (b) to interfere with or disrupt the use and peaceful enjoyment of other tenants in the Building. Contractor shall have priority over Tenant's Work.

4. Tenant and Tenant's contract parties shall perform their work, including any storage for construction purposes, within the Premises only. Tenant shall be responsible for removal, as needed, from the Premises and the Building of all trash, rubbish, and surplus materials resulting from any work being performed in the Premises. Tenant shall exercise extreme care and diligence in removing such trash, rubbish, or surplus materials from the Premises to avoid littering, marring, or damaging any portion of the Building. If any such trash, rubbish, or surplus materials are not promptly removed from the Building in accordance with the provisions hereof or if any portion of the Building is littered, marred, or damaged, Landlord may cause same to be removed or repaired, as the case may be, at Tenant's cost and expense. Tenant shall pay Landlord the amount of any such cost and expenses promptly upon demand therefor.

## ARTICLE 4 DESIGNATION OF REPRESENTATIVES

### Section 4.01 Landlord's Agent

Landlord hereby designates _____________ to act as its authorized representative on this Work Agreement. Any response from such person under this Work Agreement shall be the response of Landlord.

### Section 4.02 Tenant's Agent

Tenant hereby designates Springer Douglas (804-267-8732) to act as its authorized representative on this Work Agreement. Any response from such person under this Work Agreement shall be the response of Tenant.

Section 4.03 Mutual Cooperation

Landlord's Agent and Tenant's Agent shall cooperate with one another in coordinating Substantial Completion of Tenant's Work, and in controlling and minimizing the time and costs of the Tenant Improvements and Tenant Work.

## ARTICLE 5. ADA COMPLIANCE

Section5.01 Building

Tenant shall not be obligated to pay for Building compliance with the Americans with Disability Act ("ADA"), unless such compliance arises out of Tenant's specific use of the Premises and Building.

Section 5.02 Tenant's Improvements

Tenant Improvements shall be and Tenant shall cause the Tenant Space Plan to be in compliance with the ADA, to the extent the ADA requirements are applicable and mandatory and are not voluntary (but not mandatory) for such Tenant Improvements.

Exhibit C

**QUARTERLY MONITORING REPORT**
**PERIOD ENDING MAY 2006**
**100 NORTH MAIN STREET**
**PROVIDENCE, RHODE ISLAND**
**LS2825**

**July 13, 2006**

Prepared for:

MSI Holdings, LLC
128 Dorrance Street
Providence, Rhode Island 02903

Prepared by:

Lincoln Environmental, Inc.
333 Washington Highway
Smithfield, Rhode Island 02917

F:\Client Files\01448\Quarterly Rpts\May 06.doc

## 1.0 INTRODUCTION

This report is the second of four quarterly monitoring reports for the property located at 100 North Main Street, Providence, Rhode Island (site), as required per the Notice of Intent to Enforce dated January 11, 2006. After completion of four successive quarterly monitoring events, subsequent monitoring and reporting will be performed annually. The report is provided by Lincoln Environmental, Inc. (Lincoln) on behalf of MSI Holdings, LLC.

Passive bailers were employed at the site to recover No. 2 fuel oil from the subsurface during the period from March 1995 through March 1997. A total fluids recovery system was then operated from April 1997 through November 1997. From December 1997 until November 1999, separate phase petroleum recovery was accomplished with four passive bailers. In November 1999, the number of operating passive bailers was reduced to one. Also, site monitoring was reduced to annual gauging of four wells with an interface probe.

This is a report of separate phase petroleum recovery and well gauging conducted on May 23, 2006. A **site plan** is included as **Figure 1.**

## 2.0 GROUNDWATER LEVEL GAUGING

Depth to groundwater was measured with an interface probe on May 23, 2006 at wells ESS-3, RW-1, MW-13 and MW-11. Water level measurements are included in the **Appendix**. Separate phase petroleum was observed at wells RW-1, MW-11 and MW-13 at thicknesses of 0.02, 0.02 and 0.80 feet respectively. No separate phase petroleum was observed in well ESS-3. No weekly monitoring was conducted during the monitoring period. A historical summary of separate phase petroleum thicknesses is included in **Table 1.**

## 3.0 PETROLEUM RECOVERY

Separate phase petroleum is collected in a passive bailer (Hydro-Skimmers by Welex Environmental, Inc.) installed in monitor well MW-11. On May 23, 2006, Lincoln bailed and recovered approximately 68 ounces of separate phase petroleum from well MW-13. Also, approximately eight ounces of separate phase petroleum was recovered from the passive bailer in MW-11. Passive bailer petroleum recovery is summarized in **Table 2**.

Recovered petroleum is temporarily stored on-site in a 5-gallon disposal can equipped with a flame arrester and a spring loaded cap.

## 4.0 FUTURE ACTIVITIES

Separate phase petroleum recovery will continue at well MW-11 using a passive bailer. The next scheduled well gauging event will be in August 2006.

## 5.0 LIMITATIONS

Information obtained from site inspection, and limited well gauging was used to characterize the site only in regards to site monitoring conducted on May 23, 2006. The accuracy of the conclusions derived from this information is based solely on the accuracy of the information reported. Events occurring on the site after May 23, 2006 are beyond the scope of this report. If information becomes available concerning the site, which is not included in this report, it should be made available to Lincoln so that conclusions and/or recommendations can be re-examined and modified where applicable.

No attempt was made to determine the compliance of present or former owners or operators of the site with federal, state, or municipal environmental or land use laws or regulations. Due to the fact

that geological and soil formations are inherently random, variable and indeterminate (heterogeneous) in nature, the professional services and opinions provided by Lincoln under this agreement are not guaranteed to be a representation of complete site conditions, which are subject to change with time as a result of natural or man-made processes. Although the services are extensive, findings and conclusions are limited to and by the information obtained. Lincoln makes no expressed or implied representations or warranties regarding any changes in condition of the premises after May 23, 2006. In addition, further subsurface investigatory methods are available that could further define the soil and groundwater conditions.

No representation regarding the potential results of additional field screening, laboratory testing, or regarding the potential results or tests for materials not tested for is expressed or implied. Any qualitative or quantitative information regarding the site, which was not available to Lincoln during the reporting period, may result in a modification of the representations made in this report.

Lincoln has retained a copy of this report. No additions or deletions are permitted without the written consent of Lincoln. Use of this report in whole or in part by parties other than those authorized by Lincoln is prohibited.


FIGURE 1
LINCOLN ENVIRONMENTAL
SITE PLAN
100 NORTH MAIN STREET
PROVIDENCE, R.I.
DATE : 11/11/96
SCALE : 1" = 40'
DRAWN BY : JM
LE JOB NO. SR5002
GRAPHIC SCALE
0
20
40
80
N
NORTH MAIN STREET
ELIZABETH STREET
PARKING LOT
APPROXIMATE LOCATION OF FOUNDATION WALLS
100 NORTH MAIN STREET
WELL IN BASEMENT
PARKING LOT
GRANITE CURB
THROOP ALLEY
189 CANAL STREET
CANAL STREET
HAMMETT LANE
ESS-1
ESS-2
ESS-3
ESS-4
MW-1
MW-2
MW-3
MW-8
MW-9
MW-10
MW-11
MW-12
MW-13
MW-14
MW-15
RW-1
CP-1
CP-2
CP-3
CP-4
CP-5
CP-6
CP-7

# WATER LEVEL MEASUREMENTS

| | | | |
|---|---|---|---|
| *Location* | 100 North Main St, Providence | *Lincoln No.* | 01448 |
| *Client* | MSI Holdings, LLC | *Date* | 5/23/2006 |
| *Instrument* | ORS Interface Probe | *Gauged By* | |
| *Checked By* | | *M.P. Elevations : 3/15/95 survey* | |

| WELL # | M.P. ELEVATIONS | DEPTH TO PRODUCT | DEPTH TO WATER | PRODUCT THICKNESS | EQUIVALENT HD ELEVATION |
|---|---|---|---|---|---|
| ESS-3 | 109.12 | | 11.06 | 0.00 | 98.06 |
| RW-1 | 106.88 | 7.52 | 7.54 | 0.02 | 99.36 |
| MW-13 | 107.14 | 7.64 | 8.44 | 0.80 | 99.34 |
| MW-11 | 107.73 | 9.68 | 9.70 | 0.02 | 98.05 |

Notes:

**Table 1** Summary of Separate Phase Petroleum Gauging
100 North Main Street
Providence, Rhode Island

| Date | Petroleum Thickness, Feet | | | | | |
|---|---|---|---|---|---|---|
| | ESS-3 | MW-1 | MW-11 | MW-13 | MW-15 | RW-1 |
| 3/15/1995 | 0.27 | 0.07 | [illegible] | [illegible] | NE | NE |
| 5/25/1995 | 0.68 | ND | 0.01 | [illegible] | NE | NE |
| 8/2/1995 | ND | ND | ND | [illegible] | ND | NE |
| 4/8/1997 | 0.01 | ND | [illegible] | [illegible] | ND | ND |
| 5/21/1997 | ND | ND | [illegible] | [illegible] | ND | ND |
| 6/4/1997 | ND | ND | [illegible] | [illegible] | ND | ND |
| 6/11/1997 | 0.48 | ND | [illegible] | [illegible] | ND | ND |
| 6/27/1997 | 0.39 | 0.01 | NG | [illegible] | ND | ND |
| 7/25/1997 | [illegible] | ND | [illegible] | [illegible] | ND | ND |
| 8/27/1997 | 0.35 | ND | [illegible] | [illegible] | ND | [illegible] |
| 12/17/1997 | 0.65 | ND | [illegible] | NG | NG | NG |
| 2/23/1998 | [illegible] | [illegible] | [illegible] | [illegible] | ND | 0.03 |
| 3/6/1998 | ND* | [illegible] | [illegible] | ND* | ND | NG |
| 5/29/1998 | [illegible] | ND* | [illegible] | ND* | 0.06 | 0.07 |
| 6/10/1998 | NG | NG | NG | NG | ND | NG |
| 6/24/1998 | NG | NG | NG | NG | ND | NG |
| 7/8/1998 | NG | NG | NG | NG | ND | NG |
| 7/21/1998 | NG | NG | NG | NG | ND | NG |
| 8/10/1998 | NG | NG | NG | NG | ND | NG |
| 8/25/1998 | 0.02 | ND* | [illegible] | 0.01* | 0.01 | 0.03 |
| 9/9/1998 | NG | NG | NG | NG | ND | NG |
| 9/23/1998 | NG | NG | NG | NG | ND | NG |
| 10/8/1998 | NG | NG | NG | NG | ND | NG |
| 10/21/1998 | NG | NG | NG | NG | ND | NG |
| 11/3/1998 | [illegible] | ND* | 0.40 | ND* | ND | 0.03 |
| 11/18/1998 | NG | NG | NG | NG | ND | NG |
| 12/2/1998 | NG | NG | NG | NG | ND | NG |
| 12/16/1998 | NG | NG | NG | NG | ND | NG |
| 12/29/1998 | NG | NG | NG | NG | ND | NG |
| 1/13/1999 | NG | NG | NG | NG | ND | NG |
| 1/28/1998 | NG | NG | NG | NG | ND | NG |
| 2/16/1999 | 0.01 | ND* | [illegible] | 0.12 | ND | 0.02 |
| 3/3/1999 | NG | NG | NG | NG | ND | NG |
| 3/18/1999 | NG | NG | NG | NG | ND | NG |
| 4/1/1999 | NG | NG | NG | NG | ND | NG |
| 4/15/1999 | NG | NG | NG | NG | ND | NG |
| 4/29/1999 | NG | NG | NG | NG | ND | NG |
| 5/14/1999 | 0.02 | ND* | [illegible] | 0.02 | ND | ND |
| 6/10/1999 | NG | NG | NG | NG | ND | NG |
| 6/24/1999 | NG | NG | NG | NG | ND | NG |
| 7/6/1999 | NG | NG | NG | NG | ND | NG |
| 7/19/1999 | NG | NG | NG | NG | ND | NG |
| 8/2/1999 | ND | ND | 0.74 | 0.04 | ND | 0.02 |
| 8/16/1999 | NG | NG | NG | NG | ND | NG |
| 11/29/1999 | ND | ND | [illegible] | 0.02 | ND | 0.03 |
| 11/20/2000 | ND | NG | [illegible] | 0.05 | NG | 0.02 |
| 11/19/2001 | ND | NG | [illegible] | 0.05 | NG | 0.04 |
| 12/20/2002 | ND | NG | [illegible] | 0.09 | NG | 0.03 |
| 2/4/2004 | ND | NG | [illegible] | [illegible] | NG | ND |
| 2/1/2006 | ND | NG | [illegible] | [illegible] | NG | 0.01 |
| 5/23/2006 | ND | NG | 0.02* | 0.80 | NG | 0.02 |

* A passive bailer was in the well immediately prior to gauging
ND = Not Detected
NE = The well did not exist at the date of gauging.
NG = Not Gauged

**Table 2** **Summary of Petroleum Recovery**
**By Passive Bailer**
**100 North Main Street**
**Providence, RI**

| Month | Petroleum Recovery, (ounces) | | | |
|---|---|---|---|---|
| | ESS-3 | MW-1 | MW-11 | MW-13 |
| March-95 | 0 | 0 | 12 | |
| April-95 | 0 | 3 | 88 | |
| May-95 | 5 | 2 | 22 | |
| June-95 | 0 | 0 | 38 | 200 |
| July-95 | | 0 | 20 | 216 |
| August-95 | | 0 | 52 | 540 |
| September-95 | | 0 | 23 | 243 |
| October-95 | | 0 | 19 | 94 |
| November-95 | | 0 | 12 | 140 |
| December-95 | | 0 | 8 | 119 |
| January-96 | | 0 | 9 | 87 |
| February-96 | | 0 | 15 | 57 |
| March-96 | | 0 | 15 | 18 |
| April-96 | | 0 | 17 | 17 |
| May-96 | | 0 | 13 | 19 |
| June-96 | | 0 | 11 | 14 |
| July-96 | | 0 | 14 | 15 |
| August-96 | | 0 | 9 | 13 |
| September-96 | | 0 | 11 | 11 |
| October-96 | | 0 | 12 | 10 |
| November-96 | | 0 | 6 | 9 |
| December-96 | | 0 | 9 | 5 |
| January-97 | | 0 | 11 | 8 |
| February-97 | | 0 | 5 | 4 |
| March-97 | | 0 | 4 | 4.5 |
| March-98 | 18 | 0 | 37 | 7 |
| April-98 | 4 | 0 | 9 | 2 |
| May-98 | 4 | 0 | 22 | 3 |
| June-98 | 3 | 0 | 72 | 6 |
| July-98 | 6 | 0 | 12 | 1 |
| August-98 | 2 | 0 | 8 | 2 |
| September-98 | 0 | 0 | 64 | 1 |
| October-98 | 0 | 0 | 42 | 0 |
| November-98 | 0 | 0 | 50 | 0 |
| December-98 | 0 | 0 | 73 | 6 |
| January-99 | 1 | 0 | 41 | 3 |
| February-99 | 0 | 0 | 36 | 0 |
| March-99 | 0 | 0 | 57 | 0 |
| April-99 | 0 | 0 | 168 | 0 |
| May-99 | 0 | 0 | 78 | 1 |

**Table 2, Continued**

| Month | Petroleum Recovery, (ounces) | | | |
|---|---|---|---|---|
| | ESS-3 | MW-1 | MW-11 | MW-13 |
| June-99 | 0 | 0 | 125 | 1 |
| July-99 | 0 | 0 | 131 | 0 |
| August-99 | 0 | 0 | 131 | 0 |
| September-99 | 0 | 0 | 97 | 6 |
| October-99 | 0 | 0 | 86 | 0 |
| November-99 | 0 | 0 | 59 | 0 |
| December-99 | | | 117 | |
| January-00 | | | 44 | |
| February-00 | | | 78 | |
| March-00 | | | 91 | |
| April-00 | | | 96 | |
| May-00 | | | 77 | |
| June-00 | | | 62 | |
| August-00 | | | 98 | |
| September-00 | | | 0 | |
| October-00 | | | 52 | |
| November-00 | | | 132 | |
| December-00 | | | 55 | |
| January-01 | | | 61 | |
| February-01 | | | 36 | |
| March-01 | | | 47 | |
| April-01 | | | 39 | |
| May-01 | | | 56 | |
| June-01 | | | 45 | |
| July-01 | | | 26 | |
| August-01 | | | 100 | |
| September-01 | | | 69 | |
| October-01 | | | 83 | |
| November-01 | | | 162 | |
| December-01 | | | 85 | |
| January-02 | | | 157 | |
| February-02 | | | 25 | |
| March-02 | | | 38 | |
| April-02 | | | 43 | |
| May-02 | | | 41 | |
| March-03 | | | 37 | |
| April-03 | | | 40 | |
| May-03 | | | 13 | |
| February-04 | | | 68 | 17 |
| February-06 | | | 2 | 192 |
| May-06 | | | 68 | 8 |
| Total: | 43 | 5 | 4,096 | 2,100 |

F:\Client Files\Excel\01448\Annual Mon.xls